UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Mary Susan Thibault,

      Plaintiff,

    v.                                                          Civil Action No. 5:10-CV-188

Michael J. Astrue, Commissioner of
Social Security Administration,

      Defendant.

## REPORT AND RECOMMENDATION
(Docs. 9, 12)

Plaintiff Mary Susan Thibault brings this action pursuant to 42 U.S.C. § 405(g) of

the Social Security Act, requesting review and remand of the decision of the

Commissioner of Social Security ("Commissioner") denying her application for disability

insurance benefits.  Pending before the Court are Thibault's motion to reverse the

Commissioner's decision (Doc. 9)[1], and the Commissioner's motion to affirm (Doc. 12).

---

[1] Plaintiff's motion (and to a lesser extent, Plaintiff's reply) does not comport with the Local Rules of Procedure.  Specifically, Local Rule 10(a)(4) and (6) require that motions be typed in "no less than 12 point font" and be "double-spaced, except for quoted material."  The motion filed in this case does not appear to be double-spaced, and employs several different font sizes, all appearing to be less than twelve point.  In fact, the footnotes and certain block quotations are single-spaced and set in such miniscule type that they are difficult to read, in contravention of Local Rule 10(a)(2), which requires that motions "be plainly legible."  Presumably, Plaintiff's counsel drafted the motion in this manner in an attempt to limit the motion to twenty-five pages, as required by Local Rule 9(6)(A), but counsel gains no advantage by ignoring certain rules of procedure in an attempt to comply with others.

Adherence to the Local Rules regarding the filing of motions is critical to the court's expeditious and efficient administration of justice.  *Lake Cnty. Riverboat L.P. v. Illinois Gaming Bd.*, 730 N.E.2d 524, 534 (Ill. App. Ct. 2000); *see Kano v. Nat'l Consumer Co-op. Bank*, 22 F.3d 899, 899 (9th Cir. 1994) (imposing sanctions in the amount of $1,500 for formatting violations); *TK-7 Corp. v. Estate of Barbouti*, 966 F.2d 578, 579 (10th Cir. 1992) (striking brief due to formatting violations); *Westinghouse Elec. Corp.*

For the reasons stated below, I recommend granting Thibault's motion, in part, and remanding to the Commissioner for further consideration of the Administrative Law Judge's Step Five determination of jobs in the national economy that Thibault can do. Pursuant to Local Rule 7(a)(6), and no party having made a request for oral argument, the Court finds that oral argument is not required.

## Background

Thibault was born on October 29, 1964, and thus was thirty-two years old on the alleged disability onset date of May 1, 1997. (Administrative Record ("AR") 166, 202, 240.) She attended Allegheny College and then Moravian Theological Seminary, obtaining a master's degree in pastoral counseling. (AR 35, 215, 323, 351.) She has significant experience working in the social services industry as a mental health therapist, a caseworker, and a human services coordinator for various social service agencies. (AR 36, 208, 225-30, 351.) She is married and has four children, for whom she is the primary caregiver. (AR 35, 37.) Thibault suffers from depression, attention difficulties, short term memory impairment, anxiety, impaired sleep, and fatigue. (AR 323.)

In July of 1993, Thibault was involved in an automobile accident where she lost control of her car, causing it to roll over several times. (AR 207, 276-322, 348, 351.) In the months following the accident, the record reflects that Thibault reported changes in her cognitive functioning, including difficulty organizing her thoughts and short-term

---

*v. N.L.R.B.*, 809 F.2d 419, 425 (7th Cir. 1987) (imposing sanctions in the amount of $1,000 for formatting violations). Therefore, Local Rule 10(d) provides that, "[u]nless the judge directs otherwise, the court will exclude from the official file all non-conforming filings." Although Plaintiff's motion is clearly a "non-conforming filing," the Court has accepted it and will consider the arguments raised therein on their merits. Moving forward, however, counsel is advised that all future motions must adhere to the formatting requirements of Local Rules 9 and 10, or risk being excluded from the official file.

memory problems.  (AR 207, 348, 350, 358.)  Notwithstanding these cognitive problems, Thibault was able to return to work on a part-time basis approximately three months after the automobile accident.  (AR 207-08, 629.)  Over three years later, on May 2, 1997, she stopped working; and on May 20, 1997, her first child was born.  (AR 44, 47, 207.)  Since then, she has not returned to work.  (AR 207, 630.)  During each of her four pregnancies, Thibault reported experiencing an increase in depressive symptoms, as well as cognitive changes including decreased memory, forgetfulness, and decreased concentration.  (AR 207, 323, 360.)

In or around April 2008, Thibault filed an application for Disability Insurance Benefits ("DIB"), which was denied initially and on reconsideration.  (AR 69-78, 81-87, 166-70.)  Around the same time, Thibault also filed an application for Supplemental Security Income ("SSI"), which was denied in October 2008 based on a finding that Thibault's countable income exceeded applicable limits.  (AR 30, 177.)  Thibault sought no further relief on the SSI application, but through the instant action has appealed the denial of her DIB application.  Pursuant to that application, Thibault alleges that, starting on May 1, 1997, she has been unable to work due to depression, dysthymia[2], and "long[-]term issues from head injury."  (AR 207.)  She claims that, since the 1993 automobile accident, she "ha[s] had issues with being able to concentrate, stay on track, [and] remember[] things[.]"  (Id.)  On February 11, 2010, a hearing was held on Thibault's DIB application.  (AR 26-68.)  Thibault appeared and testified, and was represented by

---

[2] Dysthymia is defined as "[a] chronic mood disorder manifested as depression for most of the day, more days than not, accompanied by some of the following symptoms: poor appetite or overeating, insomnia or hypersomnia, low energy or fatigue, low self-esteem, poor concentration, difficulty making decisions, and feelings of hopelessness."  STEDMAN'S MEDICAL DICTIONARY 602 (28th ed. 2006).

counsel. (*Id.*)  Social worker Joyce Perkins and Vocational Expert ("VE") Christine

Spaulding also testified at the hearing.  (AR 55-67.)

On March 5, 2010, Administrative Law Judge ("ALJ") Paul Martin issued a

decision finding that Thibault was not disabled under the Social Security Act from her

alleged onset date of May 1, 1997 through her date last insured of December 31, 2002.

(AR 11-19.)  A few months later, after entering into the record additional evidence and

arguments, the Decision Review Board ("DRB") issued a decision which "adopt[ed]" the

ALJ's "findings or conclusions that the claimant was not disabled."  (AR 4.)  Therein, the

DRB stated that it "agree[d] with the [ALJ's] findings under steps 1, 2, 3, 4 and 5 of the

sequential evaluation[,]" but issued the decision "to provide clarification with regard to

the [ALJ's RFC] assessment . . . and to evaluate the weight attached to relevant opinion

evidence in the record." (*Id.*)  Having exhausted her administrative remedies, Thibault

filed the Complaint in the instant action on August 2, 2010. (*See* Doc. 1.)

## ALJ Determination

The Commissioner uses a five-step sequential process to evaluate disability

claims. *See Butts v. Barnhart*, 388 F.3d 377, 380-81 (2d Cir. 2004).  The first step

requires the ALJ to determine whether the claimant is presently engaging in "substantial

gainful activity."  20 C.F.R. §§ 404.1520(b), 416.920(b).  If the claimant is not so

engaged, step two requires the ALJ to determine whether the claimant has a "severe

impairment."  20 C.F.R. §§ 404.1520(c), 416.920(c).  If the ALJ finds that the claimant

has a severe impairment, the third step requires the ALJ to make a determination as to

whether the claimant's impairment "meets or equals" an impairment listed in 20 C.F.R.

Part 404, Subpart P, Appendix 1 ("the Listings"). 20 C.F.R. §§ 404.1520(d), 416.920(d). The claimant is presumptively disabled if the impairment meets or equals a listed impairment. *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the fourth step requires the ALJ to consider whether the claimant's "residual functional capacity" ("RFC") precludes the performance of his or her past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). The fifth and final step requires the ALJ to determine whether the claimant can do "any other work." 20 C.F.R. §§ 404.1520(g), 416.920(g). The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's residual functional capacity").

Employing this sequential analysis, ALJ Martin first determined that Thibault had not engaged in substantial gainful activity since her alleged onset date of May 1, 1997 through her date last insured of December 31, 2002. (AR 14.) At steps two and three, the ALJ found that Thibault had the following severe impairments: back condition, depression, and "neurocognitive residuals from a traumatic brain injury"; and that none of these impairments met or medically equaled a listed impairment. (*Id.*) Next, the ALJ determined that Thibault had the RFC to perform "medium work," as defined in 20 C.F.R. § 404.1567(c), except for the following limitations: she could perform only one

and two step tasks at a time and with no multi-tasking; and she could tolerate routine workplace changes, but would need to have a supervisor remind her of tasks and check on her work every one to two hours." (AR 16.) Based on this RFC and other vocational characteristics, at step four, the ALJ concluded that Thibault could not perform her past relevant work. (AR 17-18.) Finally, at step five, relying on the testimony of the VE, the ALJ determined that Thibault could perform other work existing in significant numbers in the national economy, including the jobs of photocopy machine operator, production assembler, electronic assembler, small parts assembler, final assembler, and printed circuit board taper. (AR 18-19.) The ALJ concluded that Thibault had not been disabled from May 1, 1997, the alleged onset date, through December 31, 2002, the date last insured. (AR 19.)

## Standard of Review

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A person will be found to be disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

In reviewing a Commissioner's disability decision, the court limits its inquiry to a "review [of] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard." *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g). A court's factual review of the Commissioner's decision is limited to determining whether "substantial evidence" exists in the record to support such decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Poupore*, 566 F.3d at 305.

Although the reviewing court's role with respect to the Commissioner's disability decision is "quite limited[,] and substantial deference is to be afforded the Commissioner's decision," *Hernandez v. Barnhart*, No. 05 Civ. 9586, 2007 WL 2710388, at *7 (S.D.N.Y. Sept. 18, 2007) (quotation marks and citation omitted), the Social Security Act "must be construed liberally because it is a remedial statute that is intended to include, rather than exclude, potential recipients of benefits," *Jones v. Apfel*, 66 F. Supp. 2d 518, 522 (S.D.N.Y. 1999); *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981) ("In its deliberations the District Court should consider the fact that the Social Security Act is a remedial statute to be broadly construed and liberally applied.").

## Analysis

### I.        Onset Date Determination

Citing to Social Security Ruling ("SSR") 83-20, Thibault argues that the ALJ erred in failing to obtain the advice of a medical expert to assist in determining her disability onset date.  But the ALJ was not required to determine an onset date because he never determined that Thibault was disabled, and it is only after an ALJ (or the Appeals Council or DRB) has made such a decision that the obligation to determine an onset date under SSR 83-20 is triggered.

SSR 83-20 states as follows: "*In addition to determining that an individual is disabled*, the decision[-]maker must also establish the onset date of disability. . . .  The onset date of disability is the first day an individual *is disabled* as defined in the Act and the regulations."  SSR 83-20, 1983 WL 31249, at *1 (1983) (emphasis added).  As these statements reveal, the premise behind SSR 83-20 is that an ALJ must have already found the claimant to have been disabled.  Conversely, it is well-established that, in cases where the ALJ does not find the claimant to have been disabled at any point in time, the procedures proscribed in SSR 83-20 are inapplicable.  *See, e.g.*, *Baladi v. Barnhart*, 33 F. App'x 562, 564 (2d Cir. 2002) ("SSR 83-20 is inapplicable [here] because the ALJ's determination that plaintiff was not disabled obviated the duty under SSR 83-20 to determine an onset date."); *Nix v. Barnhart*, 160 F. App'x 393, 396-97 (5th Cir. 2005) (absent an ALJ's finding of disability, there is no need to infer an onset date under SSR 83-20); *Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997) (agreeing that SSR 83-20 applies "only when there has been a finding of disability and it is necessary to determine

when the disability began").

Thibault's onset date argument hinges on the Court's acceptance of the statement in the Disability Determination Service ("DDS")'s September 2008 "Explanation of Determination" that "[Thibault] is disabled as of 03/19/2008" (AR 70) as a determination that Thibault was disabled, within the meaning of SSR 83-20.  However, that statement was not a final decision of the Commissioner; it merely reflected the DDS's report to the Commissioner opining that Thibault met the medical and vocational conditions of disability as of March 2008 for purposes of Thibault's SSI application.  (*Id.*)  The Commissioner ultimately determined that Thibault was not eligible to receive SSI benefits due to excess income, and denied the claim on that basis.  (AR 30, 177.) Thibault did not appeal that denial, and thus it is not reviewable by this Court. Furthermore, the ALJ never adopted the DDS's disability report,[3] and thus it never became a decision of the Commissioner.  In *Baladi v. Barnhart*, which involved a situation similar to this, the Second Circuit held as follows:

> Because SSI benefits, unlike [social security disability], can only be granted prospectively, the only issue to be determined on the [SSI] application was whether plaintiff was disabled as of the date of his application . . . and *the determination of onset date as being [prior to that date] was . . . "administrative dicta."* . . .
>
> . . . SSR 83-20 is inapplicable to the decision under review, because *the ALJ's determination that plaintiff was not disabled obviated the duty under SSR 83-20 to determine an onset date.*  The . . . decision of the Commissioner granting benefits [pursuant to the SSI application] is not under review and, in any case, it appears the Commissioner fully complied

---

[3] In fact, the ALJ appears to have disagreed with the DDS's opinion that Thibault was "disabled as of 03/19/2008" (AR 70), stating somewhat incidentally that "the record does not comport with total disability *even at the present time* based on [recent] testing" (AR 17 (emphasis added)).

with SSR 83-20 in that decision because . . . the non[-]retroactive nature of SSI benefits required the Commissioner only to determine that plaintiff was disabled as of the date of his second application.  As long as the onset date was deemed to be prior to the date of application, therefore, there was no need to determine the onset date more precisely.

*Id.* at 564 (emphasis added).

Thibault cites no authority holding that an ALJ must infer an onset date in a case like this, where there is no determination of disability, or, more specifically, where there is merely a DDS-recommended determination of disability which the Commissioner does not adopt.  In both the Sixth and Seventh Circuit cases cited in Thibault's brief, the ALJ (and the Appeals Council in the former case) specifically determined that the claimant was disabled, but then proceeded to set an onset date different than that alleged by the claimant.  *See Willbanks v. Sec'y of Health & Human Servs.*, 847 F.2d 301, 301-02 (6th Cir. 1988); *Lichter v. Bowen*, 814 F.2d 430, 431 (7th Cir. 1987).  Those facts clearly differ from the situation here, where the ALJ never found Thibault to be disabled.  Moreover, Thibault's citation to this Court's holding in *Goulet v. Astrue*, No. 2:09-cv-208 (D. Vt. Oct. 15, 2010) is unavailing, as in that case, we specifically noted the ALJ's "determination" that the claimant "'ha[d] been disabled' during some period of time from the alleged disability onset date until the date of the ALJ decision."  Slip op. at 15.  We further stated that, "*once the ALJ made that determination*, he was obligated to follow the principles set forth in SSR 83-20 and the applicable case law in inferring an onset date."  *Id.* (emphasis added); *see also Plumley v. Astrue*, No. 2:09-cv-42, 2010 WL 520271, at *5 (D. Vt. Feb. 9, 2010) ("[W]here a claimant . . . *has already been found disabled* . . ., SSR 83-20 requires the ALJ to determine the onset date of disability.") (emphasis added).

Here, in contrast, the ALJ did not determine that Thibault was disabled.  Therefore, the requirements of SSR 83-20 do not apply, and Thibault's argument that the Commissioner was obligated to obtain the advice of a medical expert to assist in determining an onset date lacks merit.

In connection with her SSR 83-20 onset date argument, Thibault cites to the August 2008 reports of consultative agency psychologists Drs. Richard Root and Thomas Reilly (AR 632-33, 637-59), the November 2008 and July 2009 reports of treating neuropsychologist Dr. Laura Flashman (AR 719, 754-55), and the January 2009 report of treating neuropsychologists Drs. Almos Nagy and Thomas McAllister (AR 738, 743). But of these reports, only one hypothesizes that Thibault's current cognitive deficiencies may relate back to the insured period, providing support for the ALJ's statement that "the record is largely silent about cognitive deficits during the period prior to December 31, 2002, the date the claimant was last insured for disability benefits." (AR 17.)  The one report that suggests Thibault's cognitive deficiencies may relate back to the insured period is that of Dr. Root, which states, "it is hypothesized that it is likely that the motor vehicle accident head trauma may have lowered [Thibault's memory functioning] scores[.]" (AR 633.)  But Dr. Root then acknowledges the dearth of records from the relevant time period, stating, "getting further records from [Thibault's] hospitalization at the time of her motor vehicle accident would be very helpful." (*Id.*)  Moreover, Dr. Root's conclusion in his August 2008 report addresses Thibault's ability to work only on the date of the report, not during the insured period over five years earlier, stating: "I believe Ms. Thibault would have significant problems functioning within a work setting .

. . given the multiple problems noted." (*Id.*)

Furthermore, Dr. Flashman specifically asserted in her July 2009 report that she was "not able" to state whether Thibault had serious deficits in cognitive abilities "continually" since July 12, 1993, the date of Thibault's automobile accident, "as [Thibault] was only seen [for a neuropsychological evaluation] at two points of time[, October 1993 and November 2008]." (AR 755.) Dr. Flashman further noted that Thibault's deficits were "overall less severe" in 2009 than they were in 1993, "which would be expected, as [the 1993] testing point was done only 3 months post-injury and further improvement would be anticipated." (*Id.*; *see also* AR 754 ("Of note, the [1993 neuropsychological test report] occurred only 3 months post-injury, and further spontaneous recovery of function (both cognitive and physical) would be expected to occur for the next 9-12 months.").) She also opined that, since 1993, "[t]here have been mild improvements in short term memory for stories and concentration in some areas[.]" (AR 755.) Thus, Dr. Flashman's 2009 opinion acknowledges probable differences in Thibault's cognitive abilities during the time period immediately following Thibault's 1993 automobile accident and during the insured period from 1997-2002; noting that, although Thibault would have been more severely impaired in the immediate few months following her automobile accident, this level of impairment would not have been long-lasting and Thibault's cognitive abilities would have improved thereafter. Significantly, Dr. Flashman opted against offering an opinion on when such improvement began, stating: "There have been some mild improvements based on the two testing points in time [(October 1993 and November 2008)], but no information is available on other time

points." (*Id.*)

Drs. Nagy and McAllister also struggled to connect Thibault's level of cognitive impairment in 2009 with her level of impairment during the insured period, stating: "[I]t is difficult to determine to what extent [Thibault's] cognitive symptoms are directly related to [her mild traumatic brain injury occurring more than fifteen years ago], and to what extent they are due to depression.  It is a further question what role the [traumatic brain injury] has in her depressive symptoms." (AR 743.)  Drs. Nagy and McAllister further stated that, "[t]he details regarding symptom severity and treatment history are not clear from th[e] time period [before her traumatic brain injury]." (AR 740.)  Reflecting their opinion that Thibault's cognitive symptoms were more severe at the time of their examination in 2009 than they were during the insured period, Drs. Nagy and McAllister stated that, although Thibault had a "long [history of] depression," it "appears to be worsening in [the] last several months." (AR 743.)  The 2008 and 2009 reports of consultative agency psychologists Drs. Thomas Reilly and Russell Phillips are in accord, noting that Thibault "did not report any change in her cognitive functioning, and did not allege any long-term consequences of her car accident in any of the evidence from [the insured] period," and opining that the findings of cognitive deficiencies in the "current evidence" "[could not] be extrapolated back to [Thibault's alleged onset date] because of the currently assessed severe symptoms of depression and anxiety." (AR 734 (quotation marks and citation omitted).)

The best evidence from a treatment provider which supports Thibault's claim of disabling cognitive problems during the insured period is the testimony of licensed

13

clinical social worker Joyce Perkins at the administrative hearing. (*See* AR 55-59.)

Therein, Perkins advised the ALJ that, although Thibault was diagnosed with a traumatic

brain injury in 1993, proper cognitive testing was not completed at that time, and thus

Thibault's cognitive impairments went undiagnosed and untreated for years. (AR 58-59.)

However, referring to the fact that Perkins did not begin treating Thibault until

"November of 2007" (AR 56), approximately five years after the date last insured, the

ALJ reasonably determined that Perkins' testimony, "while helpful, is largely speculative

in nature relative to [Thibault's] status eight years earlier." (AR 17.)

## II.    Lay Evidence of Onset

Thibault's next argument also largely relies on application of SSR 83-20's onset

date requirement. (*See* Doc. 9 at 16-17.)  Specifically, Thibault contends that, in

determining the onset date of disability, the Commissioner should have accorded weight

to the following lay evidence: (a) Thibault's own self-reporting of her impairments and

limitations (*see, e.g.,* AR 42-43, 47, 49-50, 52-53); and (b) the "Statement" of Christine

Arvizu, Thibault's neighbor, who apparently provided childcare-related assistance to

Thibault at Thibault's home since the year 2002 (*see* AR 270-71).  To the extent that

Thibault's argument relies on SSR 83-20, it fails for the same reason the prior argument

fails: the requirements of SSR 83-20 with respect to determining a disability onset date

do not apply in this case, given that there was never a determination that Thibault was

disabled.

With respect to Thibault's argument regarding her own self-reporting, it is more

properly addressed below, in the context of the ALJ's credibility determination.  As for

Arvizu's Statement, the ALJ was not required to discuss it, given that Arvizu was not a medical source offering an opinion about Thibault's "ability to understand, to carry out and remember instructions, and to respond appropriately to supervision, coworkers, and work pressures in a work setting." 20 C.F.R. § 404.1513(c)(2).  Generally, as fact-finders, ALJs are "free to accept or reject" lay testimony such as Arvizu's. *Williams v. Bowen*, 859 F.2d 255, 260 (2d Cir. 1988).  Thibault cites *Williams v. Bowen* for the proposition that an ALJ must support his or her finding that a lay witness is not credible "with sufficient specificity to permit intelligible plenary review of the record." *Id.* at 260-61.  In that case, however, the lay evidence was "critical," "uncontradicted[,]" and "generally consistent with the medical diagnoses[.]" *Id.*

Here, on the other hand, Arvizu's Statement carries minimal weight for two primary reasons.  First, the Statement mainly discusses Thibault's inability to independently manage and "run" a household of six (AR 270), but it is not difficult to imagine jobs in the national economy which require less cognitive ability than that required to manage a family of six, including four small children.  And second, the Statement indicates that Arvizu has known Thibault only "since 2002, when her son Ian was born." (AR 270.)  It appears from the record that "Ian" is Thibault's third child, and he was born in April or May of 2002.  (AR 411, 413, 563, 565-66.)  Therefore, Arvizu's knowledge of Thibault is limited to the period from April or May of 2002 forward; and because Thibault's insured period ended in December 2002, Arvizu's Statement sheds light on only nine months of the five-plus-year alleged disability period.

III.     **Credibility Determination**

The ALJ found that, although Thibault's medically determinable impairments
could reasonably be expected to cause the alleged symptoms, her statements concerning
the intensity, persistence, and limiting effects of those symptoms "are not credible to the
extent they are inconsistent with the . . . [RFC] assessment." (AR 17.)  Thibault contends
that this finding is not supported by substantial evidence, and that the ALJ failed to
properly evaluate Thibault's subjective complaints.  In response, the Commissioner
argues that the ALJ was not obligated to unquestioningly accept Thibault's statements at
face value, particularly where the ALJ noted in his decision that the contemporaneous
medical records were "'largely silent about cognitive deficits'" during the insured period.
(Doc. 12 at 22 (quoting AR 17).)

It is the province of the Commissioner, not the reviewing court, to "appraise the
credibility of witnesses, including the claimant." *Aponte v. Sec'y of Health & Human
Servs.*, 728 F.2d 588, 591 (2d Cir. 1984).  If the Commissioner's findings are supported
by substantial evidence, the court must uphold the ALJ's decision to discount a
claimant's subjective complaints.  *Id.* (citing *McLaughlin v. Sec'y of Health, Educ., and
Welfare*, 612 F.2d 701, 704 (2d Cir. 1982)).  "When evaluating the credibility of an
individual's statements, the adjudicator must consider the entire case record and give
specific reasons for the weight given to the individual's statements."  SSR 96-7p, 1996
WL 374186, at *4 (Jul. 2, 1996).  These reasons "must be grounded in the evidence and
articulated in the determination or decision."  *Id.*

Applied here, although the ALJ was not obligated to accept all or even some of Thibault's subjective reporting of pain and functional limitations, he was required to explain his reasons for affording the weight given to such reporting.  Moreover, these reasons must be supported by the record.  The ALJ doubted Thibault's credibility based on the following stated factors: (1) after her 1993 motor vehicle accident, Thibault was able to return to work and maintain her skilled job for a prolonged period; (2) Thibault's treatment during the insured period was "at best, sporadic"; (3) Thibault's symptoms were "under control" and "in remission" in July and September 1997, respectively; (4) aside from the neuropsychological evaluation completed by Dr. Barbara Lauer-Listhaus in 1993 (*see* AR 350-59), "the record is largely silent about cognitive deficits" prior to the date last insured; and (5) Thibault "was able to engage in a rather wide range of daily activities, including caring for her young children[,]" during the insured period.  (AR 16-17.)  Taken as a whole, the record supports these findings.

First, the record confirms that, soon after her July 1993 motor vehicle accident, Thibault returned to work – albeit on a part-time basis – and continued working until May 1997, when her first child was born.  (AR 43-44, 207, 225-31, 350-51, 629-30.)  The ALJ acknowledged Thibault's reporting that, although she returned to work, she had difficulties with her tasks and felt her performance was poor; but also properly noted that there were no formal disciplinary or performance actions brought against her, and, "regardless of the reasons, she was able to maintain her skilled job for a prolonged period" after the accident.  (AR 16.)  Dr. Listhaus's 1993 neuropsychological evaluation supports the ALJ's determination that Thibault was able to return to work following a

brief recovery period after the accident.  The evaluation concludes: "With adequate support, [Thibault] will likely adjust to her job responsibilities fairly rapidly and be able to resume all of her previous activities within a short period of time."  (AR 358.)

Second, the ALJ's findings that Thibault's treatment during the insured period was "sporadic"; that Thibault's symptoms in July and September of 1997 were "under control" and "in remission"; and that the record is "largely silent about cognitive deficits" prior to the date last insured, are supported by the record.  Although, as pointed out by Thibault, she had many doctor appointments during the insured period (*see, e.g.,* AR 360-417); these appointments were primarily for the treatment of her depression and pregnancy-related complaints, not for cognitive issues.  Moreover, one of the two records from around the insured period which refers to cognitive problems is based solely on Thibault's self-reporting and relates the cognitive problems to Thibault's pregnancy. Specifically, a March 1997 treatment note from psychiatrist Dr. Robinder Bhangoo states that Thibault "describe[d] cognitive changes of decreased memory and forgetfulness *which she attributed to [her] pregnancy*."  (AR 360 (emphasis added).)  *See* SSR 96-7p, 1996 WL 374186, at *5 ("One strong indication of the credibility of [a claimant's] statements is their consistency . . . with other information in the case record. . . . Especially important are statements made to treating or examining medical sources.") The same note indicates that Thibault's "[t]hought processes [we]re logical and goal[-]directed," and that "[c]ognitively," Thibault "score[d] 30 out of 30 on [the] mini mental status exam."  (AR 362.)  The other medical record from around the insured period that mentions cognitive problems is an August 14, 2002 treatment note which states that

Thibault reported that she was having trouble concentrating "in large part [secondary] to having 3 children[.]" (AR 411.)

Furthermore, at least one record from the insured period reflects that Thibault's cognitive abilities were for the most part "within normal limits" at that time. (AR 392; *see also* AR 398.) Other records reflect that, during and immediately after the insured period, Thibault's depressive symptoms were "mild" (AR 371) and "in remission" (AR 372, 375) or "partial remission" (AR 377, 412); and that Thibault was "improv[ing]" (AR 387) and doing "OK," "fairly well," "well under stress," "very well," and "pretty good" (AR 379, 384-86, 389, 401, 417), although she frequently complained of (a) minor illnesses such as tonsillitis and colds (*see, e.g.,* AR 389, 417, 420); (b) stress due to financial constraints and her husband's employment status (*see, e.g.,* AR 399, 414, 420, 423); and (c) issues related to her pregnancy and the care of her newborn and other young children, including emotional instability, breastfeeding problems, trouble sleeping and lack of sleep, and irritability (*see, e.g.,* AR 385, 389, 411, 417, 423, 432, 435). This evidence provides support for the ALJ's credibility determination.

Third and finally, the ALJ's determination that Thibault was able to care for her children, prepare simple meals, and take care of household chores is supported by the record. Preliminarily, it is noteworthy that the ALJ conflictingly noted at Step Two that Thibault experienced "moderate restriction" in activities of daily living, and "required assistance from friends and family to complete tasks such as cleaning, taking care of chores for the children, meal preparation and even some personal care tasks." (AR 15.) This is in accord with Thibault's self-reporting in her Function Report that she

"frequently receive[s] help from friends to start, continue and finish basic tasks, such as cleaning, laundry, chores for the children, [and] meal preparation"; that her friends "help . . . with daily maintenance"; and that she "hire[s] people to help [her] care for the children." (AR 217-18.) But the ALJ's failure to explain this discrepancy in his statements about Thibault's ability to perform activities of daily living amounts to harmless error, at most, given that he was "free to discount [Thibault's self-reporting] on the basis of the other evidence in the case[,]" *Johnson v. Barnhart*, 449 F.3d 804, 805 (7th Cir. 2006); and substantial "other evidence" supports his determination that Thibault was able to "engage in a rather wide range of daily activities, including caring for her young children" (AR 17), during the insured period.

For example, a treatment note from December 2003, approximately one year after the date last insured, states that Thibault was pregnant again and struggling, but that she was "taking care of [the] [basic activities of living]." (AR 426.) And a treatment note dated March 2004, approximately twenty-seven months after the date last insured, states that Thibault's functioning level was "pretty good" and she was "taking care of 4 children," including a newborn. (AR 432.) This March 2004 note also indicates that, although Thibault's energy level was low, it was not as low as it was when she was pregnant and "not so low that [she was] unable to function as needed/as caretaker." (*Id.*) Furthermore, Thibault's self-reporting regarding her inability to independently perform activities of daily living such as caring for her children and completing household tasks is dated August of 2008 (*see* AR 217), over five years after the date last insured, and does not appear to relate back to the alleged disability period.

## IV.   Hypothetical to Vocational Expert

Thibault's final argument is that the ALJ erred at Step Five in failing to incorporate into his hypothetical to the VE his Step Three finding that Thibault had "moderate difficulties" in "concentration, persistence or pace," and "reported difficulty maintaining concentration for extended periods of time." (AR 15.) The ALJ also noted at Step Three that Thibault "had some difficulty with sustained concentration and learning new information." (*Id.*) In support of these findings, the ALJ cited to the November 1993 neuropsychology report of Dr. Listhaus, which found that Thibault "has significant limitations with sustained concentration which in turn limits her ability to learn new information and to retain that information which she learns." (AR 358.) In the hypothetical presented to the VE, however, the ALJ did not reference any limitations in concentration, persistence, or pace, instead merely advising the VE to imagine an individual "who is capable of routine workplace changes, but not more radical or more excessive changes[;]" who is "limited to tasks performed one at a time, and basically avoiding multi-tasking issues[;]" and who "would need to be reminded by a supervisor of the tasks at hand, especially when the task was first being learned." (AR 65.)

Generally, use of hypothetical questions to develop a VE's testimony is permitted, "provided that the questioning precisely and comprehensively includes each physical and mental impairment of the claimant accepted as true by the ALJ." *Magee v. Astrue*, No. 5:05-CV-413, 2008 WL 4186336, at *20 (N.D.N.Y. Sep. 9, 2008) (citing *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987)). Although the Second Circuit does not appear to have weighed in on the issue of whether a hypothetical

question to a VE must specifically account for limitations in concentration, persistence, and pace, other circuits have addressed the issue and held in the affirmative on facts similar to those here.  For example, in *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009), the Seventh Circuit held as follows: "When an ALJ poses a hypothetical question to a vocational expert, the question must include all limitations supported by medical evidence in the record.  More specifically, the question must account for documented limitations of 'concentration, persistence or pace.'" (Citations omitted.)  The court in *Stewart* further held that restricting the hypothetical to the ability to do "simple, routine tasks that do not require constant interactions with coworkers or the general public" does not accurately describe a claimant's documented limitations in concentration, persistence, or pace.  *Id.* at 685.  The court explained:

> The Commissioner asserts that the ALJ accounted for [the plaintiff's] limitations of concentration, persistence, and pace by restricting the inquiry to simple, routine tasks that do not require constant interactions with coworkers or the general public.  We have rejected the very same contention before.  In *Young v. Barnhart*, we held that a hypothetical with exactly those specifications did not adequately account for the plaintiff's medical limitations, including an "impairment in concentration."  362 F.3d at 1004.  The Commissioner continues to defend the ALJ's attempt to account for mental impairments by restricting the hypothetical to "simple" tasks, and we and our sister courts continue to reject the Commissioner's position.  In fact, the Social Security Administration itself rejects that position.  SSR 85-15.  The Commissioner does not acknowledge these authorities or cite any contrary precedent, nor does he explain why the hypothetical failed to include restrictions on, for example, the ability to understand instructions or respond to work pressures.  See 20 C.F.R. § 404.1545(c).  As a consequence, the vocational expert did not address these limitations when he suggested vocations such as punch-board assembler, laundry worker, or sorter.  In light of this clear line of precedent, both the ALJ's hypothetical and the Commissioner's subsequent defense of that hypothetical lack substantial justification.

*Id.* at 684-85 (citations omitted).

Similarly, in *Winschel v. Commissioner of Social Security*, 631 F.3d 1176, 1180-81 (11th Cir. 2011), the Eleventh Circuit held that the ALJ erred by failing to either "explicitly include[]" or "implicitly account for" moderate limitations in maintaining concentration, persistence, and pace in a hypothetical to the VE; and failing to indicate that medical evidence suggested the claimant's ability to work was unaffected by this limitation. The court in *Winschel* further held that limitations to simple, routine tasks or to unskilled work would not, standing alone, typically suffice to account for a claimant's moderate limitations in concentration, persistence, or pace. *Id.* at 1180. As noted by the court in *Stewart*, many other circuits have similarly held. *See, e.g., Bowers v. Astrue*, 271 F. App'x 731, 733 (10th Cir. 2008) (hypothetical including limitations for simple, repetitive, and routine work with a low stress level and only brief contact with the public did not account for impairment in concentration and attention); *Ramirez v. Barnhart*, 372 F.3d 546, 554 (3d Cir. 2004) (hypothetical restriction to simple one or two-step tasks did not account for limitations in concentration); *Kasarsky v. Barnhart*, 335 F.3d 539, 544 (7th Cir. 2003) (hypothetical about a person with borderline intelligence did not account for deficiencies in concentration); *Newton v. Chater*, 92 F.3d 688, 695 (8th Cir. 1996) (hypothetical limiting claimant to performing only simple tasks did not account for deficiencies in concentration, persistence, or pace). However, many circuits have also held that, where medical evidence demonstrates that a claimant retains the ability to engage in simple, routine, repetitive tasks or unskilled work despite deficiencies in concentration, persistence, and pace, these restrictions sufficiently account for such

deficiencies.  *See, e.g., Simila v. Astrue*, 573 F.3d 503, 521 (7th Cir. 2009) (where claimant's concentration limitations stemmed solely from chronic back pain not aggravated by sedentary work, hypothetical restricting VE's inquiry to unskilled, sedentary work adequately accounted for limitations in concentration, persistence, or pace); *Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1174-76 (9th Cir. 2008) (restricting VE's inquiry to simple, routine, repetitive tasks accounted for deficiencies where physician testified that despite claimant's slow pace, she could still "carry out simple tasks"); *Howard v. Massanari*, 255 F.3d 577, 582 (8th Cir. 2001) (restricting VE's inquiry to simple, routine, repetitive tasks accounted for deficiencies of concentration, persistence, or pace where psychologist determined that claimant could perform such tasks without severe restrictions).

Applying the law of our sister circuits here, the ALJ should have either explicitly included his "concentration, persistence, or pace limitation" in his hypothetical question to the VE, or otherwise accounted for *his own determination* that Thibault was "moderate[ly]" impaired in her "concentration, persistence or pace[.]"[4]  (AR 15.)  For example, the ALJ could have adequately accounted for Thibault's impairment in concentration, persistence, and pace by asking the VE to assume an individual who could concentrate for only brief periods of time.  *See, e.g., Jarrett v. Comm'r of Soc. Sec.*, No. 10–13911, 2011 WL 1378108, at *2 (11th Cir. 2011) (citing *White v. Comm'r of Soc.*

---

[4]  Not only did the ALJ find that Thibault had moderate difficulties in "concentration, persistence, or pace" at Step Three, but he also stated in conjunction with his RFC assessment that (a) Dr. Listhaus's 1993 neuropsychological evaluation provided "some basis for significant limitations with sustained concentration and learning new information"; and (b) Thibault "may well have had some significant cognitive limitations during the period prior to the date she was last insured[.]"  (AR 17.)

*Sec.*, 572 F.3d 272, 288 (6th Cir. 2009) (holding that hypothetical adequately accounted for limitations in concentration, persistence, and pace where ALJ expressly referenced claimant's inability to maintain attention and concentration)).  Instead, the ALJ's hypothetical to the VE included only limitations for the performance of routine and not "radical" or "more excessive" workplace changes, tasks performed one at a time, no multi-tasking, and supervision as much as every hour or two.  (AR 65.)  It cannot be said that these limitations encompass a "moderate" impairment in concentration, persistence, and pace.  Had the ALJ's hypothetical included all of the limitations which he assessed for Thibault, including the limitations in concentration, persistence, and pace, the VE's response may have been different.  Consequently, the VE's testimony does not constitute substantial evidence with which the Commissioner can meet his burden of proving that there are jobs in the national economy that Thibault can perform.

The Commissioner's only response to Thibault's argument on this issue is that the ALJ's finding regarding Thibault's concentration, persistence, and pace "was relevant only to the Step 2 and Step 3 issues of severity and equivalence to a *per se* disabling Listing-level impairment, and were not part of his RFC findings." (Doc. 12 at 24.)  In support of this contention, the Commissioner cites to a recent District of Maine case and to SSR 96-8p, which generally provides that, in making a Step Five determination, ALJs must convey to VEs an accurate portrayal of the claimant's mental RFC.  The Commissioner makes no effort to discuss or distinguish the circuit court cases cited and analyzed in Thibault's motion and above, although some of them are directly contrary to the Commissioner's position.

Moreover, *Hayes v. Astrue*, No. 2:10-cv-42-DBH, 2010 WL 5348757 (D. Me. Dec. 20, 2010), the District of Maine case cited by the Commissioner, is distinguishable. There, as in this case, the ALJ found that the claimant had moderate difficulties in maintaining concentration, persistence, and pace, but failed to transmit that limitation to a VE upon whose testimony the ALJ relied in making her Step 5 finding. United States Magistrate Judge John H. Rich III held that the ALJ did not err in failing to posit to the VE the "concentration, persistence, and pace" finding. *Id.* at *2, 3. Unlike in this case, however, in *Hayes*, the ALJ conveyed to the VE a hypothetical question containing a "limit[ation] to unskilled tasks[.]" *Id.* at *3 (quotation marks and citation omitted). Additionally, the ALJ's RFC assessment incorporated "the moderate limitations" found in the Psychiatric Review Technique Form ("PRTF") and RFC opinions of agency consultant David R. Houston, Ph.D., who had concluded at the PRTF stage of the analysis, among other things, that the claimant had moderate difficulties in maintaining concentration, persistence, or pace. *Id.* at *2. In contrast to this case, the ALJ in *Hayes* explicitly recognized the distinction between the consulting physician's PRTF and RFC findings, stating:

> Incorporating the moderate limitations [found in a checkbox portion of the RFC form] into functional work-related limitations, [Dr. Houston] concluded that [the plaintiff] is able to understand and remember simple instructions, to carry out simple tasks, to interact appropriately with supervisors and co-workers and to adapt to simple changes. *The undersigned places great weight on this opinion and has incorporated the simple instructions/tasks limitations into the residual functional capacity by restricting the [plaintiff] to unskilled tasks.*

*Id.* (citation omitted) (emphasis added). The court in *Hayes* concluded that: "The

plaintiff does not explain how the mental RFC formulated by Dr. Houston, and accurately captured by the [ALJ] through the shorthand phrase 'unskilled tasks,' failed to reflect Dr. Houston's . . . finding of moderate difficulties in maintaining concentration, persistence, or pace." *Id.* at *3.

In this case, the ALJ did not include in his hypothetical to the VE his own determination at Step Three that Thibault had "moderate difficulties" in "concentration, persistence or pace." (AR 15; *see* AR 65-66.) Neither did the ALJ otherwise account for such determination by limiting the hypothetical to unskilled work or some other restriction which would reflect moderate difficulties in concentration, persistence, or pace. Therefore, this matter should be remanded to the Commissioner so that a new hypothetical may be posed to the VE, this time including the ALJ's determination that Thibault had "moderate difficulties" in concentration, persistence, or pace.[5]

### Conclusion

For the above reasons, I recommend that the Commissioner's motion (Doc. 12) be denied; Thibault's motion (Doc. 9) be granted, in part; and this matter be remanded to the Commissioner for reconsideration of the ALJ's Step Five determination that significant numbers of jobs exist in the national economy that Thibault can perform.

---

[5] Thibault's "special accommodations" argument, found on page 24 of her moving brief, does not apply to the facts at issue here, and thus lacks merit. On remand, the hypothetical posed to the VE may still include a limitation that Thibault "would need a supervisor [to] remind her of tasks and check on her work every one to two hours." (AR 16.)

Dated at Burlington, in the District of Vermont, this 20th day of June, 2011.


/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge



Any party may object to this Report and Recommendation within fourteen days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2), 6(a), 6(d); L.R. 72(c).  Failure to timely file such objections operates as a waiver of the right to appellate review of the District Court's adoption of such Report and Recommendation. *See* Fed. R. Civ. P. 72(a); *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).